The Memorandum Decision below is hereby signed.
Dated: October 10, 2008.



*/s/ S. Martin Teel, Jr.*
_____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| ALPINE PCS, INC, | ) | Case No. 08-00543 |
| | ) | (Chapter 11) |
| Debtor. | ) | **Not for Publication in** |
| | ) | **West's Bankruptcy Reporter** |

MEMORANDUM DECISION SUPPLEMENTING ORAL DECISION RE
<u>DEBTOR'S EMERGENCY MOTIONS TO ENFORCE THE AUTOMATIC STAY</u>

This decision addresses the emergency motions of the debtor, Alpine PCS, Inc. ("Alpine"), for enforcement against the Federal Communications Commission ("FCC") of the automatic stay. The first motion (Docket Entry ("DE") No. 10) sought relief on an interim basis, and the second (DE No. 11) sought relief on a final basis.

I held a hearing on the motions on August 20, 2008, and issued an oral decision setting forth my grounds for denying the interim motion on August 21, 2008, and I adopt that oral decision as a basis for denying the second motion as well. The oral decision did not expressly address the parties' supplemental filings of August 20 and 21, 2008, and this Memorandum Decision addresses the arguments those filings raised, and supplements the

oral decision.

I

On August 12, 2008 (the "Petition Date") Alpine filed its petition commencing this bankruptcy case.  In an auction that closed in 1996, Alpine had purchased two licenses issued by the FCC (the "Licenses") to use certain radio spectrum to provide wireless telecommunications services, agreeing to pay for the purchases in installments.  Taking the position that the Licenses had automatically terminated before the Petition Date for non-payment of installments, the FCC has conducted an auction to sell the same radio spectrum.  Alpine's motions seek a declaration that the automatic stay of 11 U.S.C. § 362(a) bars the auction.

As explained below, the Licenses were automatically canceled prior to the Petition Date, and thus they are not part of Alpine's bankruptcy estate, and the auctioning of the radio spectrum does not constitute an act to collect the debt owed by Alpine to the FCC.  Consequently, § 362(a) does not bar the FCC from auctioning the rights to use the radio spectrum previously covered by the Licenses.

II

After it acquired the Licenses, Alpine began to have difficulty in making required installment payments, and on July 31, 2002, it filed a Request for Waiver with the FCC ("Waiver Request"), seeking to extend the time for it to resume making

installment payments and to waive provisions for automatic cancellation of the Licenses that would otherwise arise on August 1, 2002, based on non-payment. On January 29, 2007, the FCC denied Alpine's Waiver Request. In re Alpine PCS, Inc., 22 FCC Rcd. 1492 (Jan. 29, 2007) (the "Automatic Cancellation Order") ¶ 1. On February 28, 2007, Alpine filed a Petition for Reconsideration and a motion for stay of the Automatic Cancellation Order, and those matters are still pending before the FCC.

Without awaiting a disposition of the Petition for Reconsideration, and taking the position that Alpine's Licenses had automatically canceled on August 1, 2002, the FCC proceeded on April 4, 2008, to announce a public auction of various licenses, including licenses for the spectrum that had been covered by Alpine's Licenses. On April 18, 2008, Alpine filed a request to stay the auction. On July 7, 2008, the FCC issued an order denying the stay request. The auction began on August 13, 2008, the day after Alpine commenced this bankruptcy case. The Licenses expressly "conditioned [the Licenses' existence] upon the full and timely payment of all monies due pursuant to Sections 1.2110 and 24.711 of the [FCC's] Rules and the terms of the Commission's installment plan as set forth in the Note and Security Agreement executed by the Licensee."

III

Alpine's Licenses automatically canceled on August 1, 2002, for the reasons that follow.  The Licenses plainly stated that "[f]ailure to comply with this condition will result in automatic cancellation of this authorization."  Likewise, this condition to the Licenses' existence was reiterated in the Security Agreements provided by Alpine to the FCC.  Security Agreement ¶ 8(a) (in the event of default, "the License shall be automatically canceled pursuant to 47 C.F.R. § 1.2110").  See 47 C.F.R. § 1.2110(g)(4) (2001) (licenses automatically cancel if not paid prior to expiration of grace period).

Under the terms of the Licenses, Alpine's notes to the FCC and the FCC's rules, installment payments on Alpine's two notes were due on January 31, 2002.  Alpine failed to make these payments by that date.  Automatic Cancellation Order ¶ 8. From that date, under applicable FCC regulations, Alpine was automatically given two quarterly grace periods to make these installment payments.  47 C.F.R. §§ 1.2110(g)(4)(i) and (ii).  The grace periods applicable to Alpine thus expired two calendar quarters later, at the end of July 2002.  Alpine did not make the overdue installment payment by then.  Alpine was thus in default on its obligations to the FCC as of August 1, 2002, and the

Licenses automatically canceled,[1] unless the Waiver Request suspended those obligations. It did not.

The relevant default provisions from each of the Notes provide as follows:

> A default under this Note ("Event of Default") shall occur upon any or all of the following: a. non-payment by Maker of any Principal or Interest on the due date as specified hereinabove if the Maker remains delinquent for more than 90 days and (1) Maker has not submitted a request, in writing, for a grace period or extension of payments, if any such grace period or extension of payments is provided for in the then-applicable orders and regulations of the Commission; or (2) Maker has submitted a request, in writing, for a grace period or extension of payments, if any such grace period or extension of payments is provided for in the then-applicable orders and regulations of the Commission, and following the expiration of the grant of such grace period or extension or upon denial of such a request for a grace period or extension, Maker has not resumed payments of Interest and Principal in accordance with the terms of this Note . . . .

Alpine contends that its Waiver Request, consistent with the

---

[1] Alpine has not challenged the FCC's representation that, consistent with the plain language of the regulations, the FCC has long interpreted its regulations to mean that FCC licenses automatically cancel for non-payment. See In the Matter of Requests for Extension of the Commission's Initial Non-Delinquency Period For C and F Block Installment Payments, WT Docket No. 97-82, Order, FCC 98-290, 13 FCC Rcd. 22071, 14 Communications Reg. (P & F) 172, 1998 WL 754808 (October 29, 1998) (finding that licensees failing to make payment deadlines were subject to automatic cancellation of the licenses); In the Matter of Request for Extension of the Commission's Initial Non-Delinquency Period for C and F Block Installment Payments, WT Docket No. 97-82, Memorandum Opinion and Order, FCC 99-62, 14 FCC Rcd. 6080, 1999 WL 181805 (April 2, 1999) (affirming FCC's determination that licenses will automatically cancel if payment deadline missed).

5

express terms of the Notes, constituted a timely written request for an "extension of payments" of its debt obligations to the FCC, and thus there was no Event of Default under the Notes and cannot be one pending final adjudication of Alpine's Waiver Request (as to which a Petition for Reconsideration is still pending).

However, the quoted language from the Notes made clear that a request for a grace period or an extension of payments would be effective to prevent an Event of Default arising from a failure timely to make payments only "if any such grace period or extension of payments is provided for in the then-applicable orders and regulations of the Commission."  The applicable regulation, 47 C.F.R. § 1.2110(g)(4)(iv), made clear that once the two automatic grace periods (which ended as to Alpine on July 31, 2002) were past, and Alpine failed to bring its payments current, "[it] shall be in default, its license shall automatically cancel, and it will be subject to debt collection procedures."  No mention is made in the regulations for any extension of time for making payments beyond the two automatic grace periods.  In denying a stay of the auction, the FCC explained:

> Alpine's argument fails . . . because it ignores the immediately following language which makes clear that with respect to "grace periods" the Notes are worded conditionally -- "if any such grace period or extension of payments is provided for in the then-applicable orders and regulations of the Commission."  In 1997,

6

> the Commission eliminated individual grace period
> requests, replacing them with automatic grace periods,
> within which licensees could make installment payments
> after the deadline for two quarters with a late fee.
> If a licensee failed to pay within those two quarters,
> as Alpine did, it would be in default and its licenses
> would automatically cancel.  Thus, when Alpine failed
> to make payment by July 31, 2002, of its payment due on
> January 31, 2002, plus applicable late fees, it
> defaulted and the licenses cancelled automatically,
> consistent with the provisions in the Note and the
> Commission's rules.  Thus, Alpine's claim that it has
> not defaulted is without merit.

Alpine has failed to point to any FCC order or regulation that provided for the granting of an additional grace period or extension of payments.  Although the FCC retained the authority in appropriate circumstances to grant a waiver of its rules, including the automatic cancellation rule, that authority is not the same as an order or regulation providing for grace periods or extensions of the time for payments.  Accordingly, there was an Event of Default that led to automatic cancellation of Alpine's Licenses as of August 1, 2002.

IV

Alpine contends that the auction constitutes an interference with the Licenses that it would have in place were the FCC to grant the Petition for Reconsideration and waive the automatic cancellation rule.  Alpine is confusing two different property rights: first, its Licenses, which at this moment stand automatically canceled, and, second, its rights pursuant to the Petition for Reconsideration.

7

Alpine's right to pursue the pending Petition for Reconsideration of the denial of its Waiver Request constitutes a form of property that is property of the estate under 11 U.S.C. § 541.  But the FCC has not interfered with Alpine's Petition for Reconsideration: it is permitting Alpine to litigate the Petition for Reconsideration in the due course of the administrative process.  Although subject to Alpine's pending Petition for Reconsideration, the FCC's order denying waiver of its automatic cancellation rules is effective.  See 47 C.F.R. § 1.102(b)(3); see also Committee to Save WEAM v. FCC, 808 F.2d 113, 119 (D.C. Cir. 1986).  That is presumably why Alpine sought a stay (which has been denied) of the order denying its Waiver Request.  Because the debtor's rights pursuant to its Petition for Reconsideration did not include a stay of the automatic cancellation of the Licenses, the FCC's conducting of the auction of the Licenses does not constitute an interference with the Petition for Reconsideration.

If Alpine were to succeed on its Petition for Reconsideration and obtain a waiver of the automatic cancellation rule, then its Licenses (if not sold by then) would no longer stand canceled, and Alpine would be entitled to the protections of 11 U.S.C. § 525 with respect to cancellation of the Licenses.  See FCC v. NextWave Pers. Commc'ns Inc., 537 U.S. 293 (2003).  At this juncture, however, there are no Licenses in place

constituting property of the estate.

V

Because the Licenses were automatically canceled on August 1, 2002, they do not constitute property of the bankruptcy estate. In re Personal Communications Network, Inc., 249 B.R. 233, 237 (Bankr. E.D.N.Y. 2000). See also Fed. Aviation Admin. v. Gull Air, Inc. (In re Gull Air, Inc.), 890 F.2d 1255, 1262 (1st Cir. 1989) (holding that "when a debtor's proprietary interest [in that case, its interest in an FAA-issued license] expires by operation of an express condition, the Bankruptcy Code does not preserve that interest and prevent termination."); California v. Farmers Mkts., Inc. (In re Farmers Mkts., Inc.), 792 F.2d 1400, 1403 (9th Cir. 1986) ("the estate takes the license subject to the restrictions imposed on the debtor by [the license's governmental] transferor").

Nothing in the Bankruptcy Code, including section 525, requires a different outcome for entities not yet in bankruptcy. By its terms, section 525 applies to "a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated . . . ."  It does not purport to restrict governmental action for entities that *may in the future become a debtor* under the Code.  The Supreme Court's decision in

9

FCC v. NextWave Pers. Commc'ns Inc., 537 U.S. 293 (2003), does not hold or even suggest otherwise.  There, NextWave petitioned for bankruptcy *before* the deadline by which its installment payments needed to be made.  See 537 U.S. at 297.

Moreover, Alpine's pending Petition for Reconsideration cannot itself be viewed as a license that is protected by § 525. It is only a request that may lead to setting aside of the cancellation of the licenses, and, as noted already, the FCC is not interfering with the due processing of that request.  If the request becomes mooted by a completion of an auction sale of licenses for the same spectrum, that will not amount to interference with a license already in place as contemplated by § 525.  Alpine's reliance on NextWave is thus misplaced.

VI

The first aspect of the automatic stay addressed by Alpine's motions is that dealing with acts against property of the estate. In pertinent part, 11 U.S.C. § 362(a)(3) bars "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Similarly, 11 U.S.C. § 362(a)(4) bars any act to enforce a lien against property of the estate.  Because Alpine's Licenses were canceled prepetition, §§ 362(a)(3) and 362(a)(4) do not apply to the ongoing auction.  A debtor's property rights do not expand upon the commencement of a case.  See Moody v. Amoco Oil Co., 734

F.2d 1200, 1213 (7th Cir. 1984) ("whatever rights a debtor has in property at the commencement of the case continue in bankruptcy--no more, no less."). This principle applies to expired licenses. In re Personal Communications Network, Inc., 249 B.R. at 237 (expired FCC license); In re Yachthaven Restaurant, Inc., 103 B.R. 68, 74-76 (Bankr. E.D.N.Y. 1989); In re Edwin M. Lipscomb Farms, Inc., 90 B.R. 422, 424 (Bankr. W.D. Mo. 1988).

Moreover, the new licenses that the FCC may issue after conclusion of the auction are distinct from the canceled Licenses previously held by Alpine. "[O]nce [FCC] licenses are cancelled for nonpayment, the licenses cease to exist along with any interest in the spectrum for which the license was issued." Thacker v. FCC (In re Magnacom Wireless, LLC), 503 F.3d 984, 990 (9th Cir. 2007), cert. denied, 128 S.Ct. 2076 (Apr. 21, 2008). Alpine argues that the FCC's cancellation of a license and issuance of a new license to use the same portion of spectrum is an effective foreclosure upon and sale of the same license, which remains property of the estate. But Magnacom rejects this argument, explaining, "[a] lawful extinction of a property right . . . does not give the trustee in bankruptcy rights to other property created by that creditor." 503 F.3d at 992. The rights granted via a license to use any spectrum exclude any property right in the underlying spectrum.

It is through a debtor's realizing the value of the license

that the creditors of a licensee of broadcast spectrum may have a source of payment of their claims, not through enforcing their claims against the spectrum.  Although the FCC obtained a security interest in Alpine's Licenses, that security interest itself became a nullity once the Licenses automatically canceled.  The security interest served to secure the claim held by the FCC only so long as the Licenses remained in place, and the ongoing auction of broadcast spectrum as to which Alpine no longer has a license is not an enforcement of a security interest against the Licenses.

   Where a debtor's interest in property terminates prepetition, that property is not part of the bankruptcy estate, and the automatic stay does not apply to postpetition disposition of such property.  See In re Pettit, 217 F.3d 1072, 1077 (9th Cir. 2000); In re Alcom America Corp., 154 B.R. 97, 103, 100-11 (Bankr. D.D.C. 1993) (provisionally holding that a creditor's sale of ethanol did not violate stay because title to ethanol had passed before debtor's petition was filed), vacated in part on other grounds, 156 B.R. 873, 876, 882, 884 (Bankr. D.D.C. 1993) (adhering to provisional holding that ethanol sale did not violate § 362(a)(3)), aff'd sub nom. ALCOM America Corp. v. Arab Banking Corp., 48 F.3d 539 (D.C. Cir. 1995).  Alpine has thus not established a violation of the automatic stay with respect to property of the estate.

VII

The remaining aspect of the automatic stay addressed by Alpine's motions is that dealing with collecting a claim against the debtor.  Section 362(a)(6) of the Bankruptcy Code stays "any act to collect, assess, or recover a [prepetition] claim against the debtor. . . ."  The Code defines "claim" in relevant part as "right to payment. . . ." 11 U.S.C. § 101(5).  It further provides as a rule of construction that "claim against the debtor" includes "claim against property of the debtor."  11 U.S.C. § 102(2).  The FCC's postpetition actions cannot fairly be said to be acts to collect a claim against Alpine or against property of Alpine.

A.

First, with respect to the issue of whether this is an act to collect a claim against property of Alpine, the answer is obvious.  As demonstrated above, Alpine no longer had any property interest in the Licenses: the Licenses had automatically canceled in 2002, and with them any right to utilize the spectrum that was the subject of the Licenses.  The proceeds realized from the new auction of the spectrum that were the subject of Alpine's Licenses will not be an auction of property of Alpine, but instead of property held by the FCC on behalf of the public.  Accordingly, the FCC auction was not an act to collect a claim against property of Alpine.

An auction of nondebtor property to collect an independent claim against the nondebtor and that will not result in destruction of any interest of the debtor in property is neither an act to collect a claim from debtor property in violation of § 362(a)(6) nor an act to exercise control over property of the estate in violation of § 362(a)(3).  See <u>In re Alcom America Corp.</u>, 154 B.R. at 115-16.  Here, the FCC's auction is not an auction of property owned by anyone (other than by the FCC on behalf of the public).  Instead, it is an act of the FCC in its regulatory role to put the broadcast spectrum that was covered by the already canceled Licenses to the use that it has determined will best serve the interest of the public.  This is thus an even stronger case for concluding that there is no act to collect a claim against property of Alpine.

B.

Second, with respect to whether the FCC is acting to collect a claim against Alpine, the answer is similarly in the FCC's favor.  This is not a case of a creditor selling a debtor's collateral at auction with the debtor entitled to a credit for the amount received at auction, and liable only for the resulting deficiency in payment of its own bid amount.  Alpine concedes that the FCC's "Deficiency Payment" rule, 47 C.F.R. § 1.2104(g)(2)(i), does not apply to installment payment defaults of licensees, and applies only to "defaulting bidders" who have

14

not yet been issued licenses.  Alpine nevertheless contends that the ongoing auction process is an act of debt collection.

Alpine points to <u>In the Matter of Amendment of Part 1 of the Commission's Rules—Competitive Bidding Procedures, Third Order on Reconsideration of the Third Report and Order</u>, 19 FCC Rcd 2551 (February 11, 2004) ("Third Order"), in which the FCC stated:

> MetroPCS further claims that a 1996 letter (the "Letter") co-authored by the then-general counsel of the Commission states that the Commission would never collect from a debtor twice.  Again, MetroPCS disregards context.  The Letter describes the Commission rules as providing "that, upon default, the Commission will cancel the license and initiate debt collection procedures."  The Letter does go on to postulate that equity principles established in the Debt Collection Act and in Federal Claims Collection Standards should allow the federal government to consider, in the course of debt collection proceedings, forgiving an outstanding debt so long as the government has been made whole, penalties and costs included, in a subsequent auction.  Rather than support MetroPCS's claim, the Letter makes clear that any forgiveness of a debt arising from an installment payment default would occur only in the course of federal debt collection proceedings and not pursuant to the Commission's competitive bidding rules.

Id. at ¶ 19, <u>citing</u> Letter from William E. Kennard, General Counsel, <u>et al.</u>, 11 FCC Rcd 21,572 (1996) ("Kennard Letter"). Alpine also points to the following statement in the Third Order, in which the FCC compared licenses canceled for non-monetary defaults to licenses canceled for installment payment defaults:

> TTPS argues that the consequence of an installment payment default is unlike that of any other default in Western jurisprudence.  Yet, as we have just shown, the

15

>    consequence of any other post-licensing default on a
>    license won at a Commission auction is, under our
>    rules, comparable.  We note, however, that while
>    Commission rules provide for parity, an installment
>    payment defaulter may ultimately enjoy relief that
>    would not be available to other post-licensing
>    defaulters.  As discussed above, equity principles
>    established in the Debt Collection Act and in Federal
>    Claims Collection Standards should provide the federal
>    government with the opportunity, during debt collection
>    proceedings, to forgive an outstanding debt so long as
>    the government has been made whole (including penalties
>    and costs) in a subsequent auction.

Third Order at ¶ 32 (footnotes omitted).  Finally, Alpine quotes from the Kennard Letter.  The full passage containing the language quoted by Alpine is worth setting forth here, as it puts the matter in context:

>    Under the Debt Collection Act, as amended, 31 U.S.C.
>    Chapter 37, and Federal Claims Collection Standards, 4
>    C.F.R. Parts 101-105, it is our understanding that,
>    where there is collateral in goods or other tangible
>    property, the proceeds from the liquidation of
>    collateral would be applied to debts (and other costs)
>    due. See 4 C.F.R. § 102.10. In the case of FCC licenses
>    that are cancelled and reauctioned, however, there is
>    no liquidation of the collateral by the FCC and no
>    proceeds from the resale of the defaulted license
>    because the license is canceled and, in effect,
>    disappears.  The Commission would be simply auctioning
>    another initial license to use the same spectrum to
>    another entity, not transferring the original license.
>    Nevertheless, **although there would be no liquidation of
>    the collateral for purposes of the Debt Collection Act
>    and Federal Claims Collection Standards, the equity
>    principles established therein should allow the federal
>    government to forgive any outstanding debt so long as
>    it has been made whole (penalties and costs included)
>    in a subsequent auction.**  Thus, the Commission would
>    not be collecting from the debtor twice, but rather
>    reclaiming the license and ensuring that any remainder
>    due to the federal government on the Note is either
>    collected or recovered in a reauction (if authorized).

> . . . [W]ith regard to the issue of the rights of the debtor, or other creditors, to the excess proceeds (if any) from a reauction following a default, Section 309(j)(8) of the Communications Act provides that all proceeds from the use of competitive bidding shall be deposited in the Treasury of the United States or used to cover certain of the Commission's costs. See 47 U.S.C. § 309(j)(8).  Therefore, while the proceeds from the liquidation of the collateral through a FCC-conducted reauction would generally be applied to debts due, the Commission is constrained by the terms of the Communications Act with regard to the distribution of excess reauction proceeds to the debtor or other creditors.

Kennard Letter, 11 FCC Rcd at 21576-77.  [Emphasis added.] Alpine contends that the foregoing passages demonstrate that the FCC has an affirmative duty to mitigate, and that Alpine is entitled to offset rights that will be governed by the outcome of the re-auction of the spectrum that was covered by Alpine's Licenses.

Although Alpine owes the FCC a considerable debt, and is subject to debt collection procedures (see 47 C.F.R. § 1.2110(g)(4)(iv)), the FCC's conducting of an auction to re-license the spectrum that was formerly licensed to Alpine cannot be viewed as a debt collection act.  The proceeds realized from the new auction of the spectrum will not be an auction of property of the debtor, but instead of property held by the FCC on behalf of the public, with the FCC being the regulatory authority vested with the discretion as to how the spectrum can best be put to a use in the interest of the public.  The FCC is thus acting in the ongoing auction wearing its regulatory hat,

17

not that of a creditor collecting a debt from pledged collateral. Any effect the auction may have on Alpine (via the FCC's applying equity principles, in the exercise of its discretion, as established in the Debt Collection Act and in Federal Claims Collection Standards, to treat the proceeds as an offset against Alpine's debt) would arise only after the re-auction, and would be only incidental to the outcome of the regulatory process, and not as a result of an act designed to collect the FCC's claim against Alpine.  As the Third Order states, "any forgiveness of a debt arising from an installment payment default would occur only in the course of federal debt collection proceedings and not pursuant to the Commission's competitive bidding rules."  Third Order at ¶ 19.  The FCC's discretion to forgive a licensee's debt after the re-auction of its canceled license does not amount to a right in the licensee to an offset, and, more fundamentally, does not demonstrate an act to collect the FCC's claim, as the FCC is not proceeding against Alpine or against property of Alpine in re-auctioning the spectrum that was formerly licensed to Alpine.

Collecting a claim from nondebtor property pledged to secure a debtor's debt does not constitute an act to collect a claim against the debtor.  See In re Alcom America Corp., 154 B.R. at 115, citing Advanced Ribbons & Office Prods., Inc. v. U.S. Interstate Distrib., Inc. (In re Advanced Ribbons & Office Prods., Inc.), 125 B.R. 259, 263 (B.A.P. 9th Cir. 1991)

(collecting debtor's debt from property its shareholder pledged to secure payment of the debt was not an act to collect a claim against the debtor).  See also In re Chugach Forest Prods., Inc., 23 F.3d 241, 246 (9th Cir. 1994).  Because the payment at re-auction will not come from Alpine or Alpine's property, the conduct of the auction is not an act to collect or recover the FCC's claim against Alpine in violation of § 362(a)(6).  Whatever impact the re-auction has on the debt Alpine owes will be only incidental, and not the result of an act to collect the FCC's claim against Alpine.  Section 362(a)(6) does not bar the FCC's re-auctioning of the spectrum that was formerly licensed to Alpine.

## VIII

In accordance with the foregoing, orders follow denying Alpine's two motions.

[Signed and dated above.]

Copies to:

Debtor

Lawrence A. Katz, Esq.
[Debtor's counsel]

Frederick M. Joyce, Esq.
[Debtor's co-counsel]

Office of United States Trustee

Glenn D. Gillett, Esq.
Civil Division
U.S. Department of Justice
P.O. Box 875
Ben Franklin Station
Washington, DC 20044-0875